**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ARROWHEAD REGIONAL MEDICAL CENTER )
400 North Pepper Avenue )
Colton, CA 92324 )
)
ASPIRUS WAUSAU HOSPITAL )
333 Pine Ridge Boulevard )
Wausau, WI 54401 )
)
BATON ROUGE GENERAL MEDICAL CENTER )
3600 Florida Boulevard )
Baton Rouge, LA 70806 )
)
BAY PARK COMMUNITY HOSPITAL )
2142 North Cove Boulevard )
Toledo, OH 43606 )
)
BIXBY MEDICAL CENTER )
2142 North Cove Boulevard )
Toledo, OH 43606 )
)
CENTRAL MAINE MEDICAL CENTER )                      Case No. 16-1544
300 Main Street, Box A )
Lewiston, ME 04240 )
)
DANBURY HOSPITAL )
24 Hospital Avenue )
Danbury, CT 06810 )
)
EASTERN OKLAHOMA MEDICAL CENTER )
105 Wall Street )
Poteau, OK  74953 )
)
FLOWER HOSPITAL )
2142 North Cove Boulevard )
Toledo, OH 43606 )
)
FRANCISCAN MISSIONARIES OF OUR LADY )
HEALTH SYSTEM d/b/a Our Lady of The Lake Regional )
Medical Center )
4200 Essen Road )
Baton Rouge, LA 70808 )

FRANCISCAN MISSIONARIES OF OUR LADY    )
HEALTH SYSTEM d/b/a Our Lady of The Lourdes    )
Regional Medical Center    )
4200 Essen Road    )
Baton Rouge, LA 70808    )
    )
FRANCISCAN MISSIONARIES OF OUR LADY    )
HEALTH SYSTEM d/b/a Saint Elizabeth Hospital    )
4200 Essen Road    )
Baton Rouge, LA 70808    )
    )
FRANCISCAN MISSIONARIES OF OUR LADY    )
HEALTH SYSTEM d/b/a St. Francis Medical Center    )
4200 Essen Road    )
Baton Rouge, LA 70808    )
    )
HARDIN MEMORIAL HOSPITAL    )
913 North Dixie Avenue    )
Elizabethtown, KY 42701    )
    )
HI-DESERT MEDICAL CENTER    )
6601 White Feather Road    )
Joshua Tree, CA 92252    )
    )
HUNTSVILLE MEMORIAL HOSPITAL    )
110 Memorial Hospital Drive    )
Huntsville, TX 77340    )
    )
LAFAYETTE GENERAL HEALTH d/b/a    )
Acadia General Hospital    )
1214 Coolidge Avenue    )
Lafayette, LA 70503    )
    )
LAFAYETTE GENERAL HEALTH d/b/a    )
Lafayette General Medical Center    )
1214 Coolidge Avenue    )
Lafayette, LA 70503    )
    )
LAFAYETTE GENERAL HEALTH d/b/a    )
Lafayette General Surgical Hospital    )
1214 Coolidge Avenue    )
Lafayette, LA 70503    )

LAFAYETTE GENERAL HEALTH d/b/a            )
University Hospital & Clinics            )
1214 Coolidge Avenue            )
Lafayette, LA 70503            )
            )
LIMA MEMORIAL HEALTH SYSTEM            )
1001 Bellefountaine Avenue            )
Lima, OH 45804            )
            )
MARIN GENERAL HOSPITAL            )
250 Bon Air Road            )
Greenbrae, CA 94904            )
            )
MEMORIAL HOSPITAL            )
2142 North Cove Boulevard            )
Toledo, OH 43606            )
            )
METROHEALTH MEDICAL CENTER            )
2500 MetroHealth Drive            )
Old Brooklyn Campus SM. 1-34            )
Cleveland, OH 44109            )
            )
MONROE REGIONAL HOSPITAL            )
2142 North Cove Boulevard            )
Toledo, OH 43606            )
            )
MOUNT NITTANY MEDICAL CENTER            )
1800 East Park Avenue            )
State College, PA 16803            )
            )
NEW MILFORD HOSPITAL            )
21 Elm Street            )
New Milford, CT 06776            )
            )
NORTH OAKS MEDICAL CENTER, LLC            )
15790 Paul Vega MD Drive            )
Hammond, LA 70404            )
            )
NORWALK HOSPITAL            )
34 Maple Street            )
Norwalk, CT 06856            )
            )
PRIME HEALTHCARE SERVICES d/b/a Alvarado            )
Hospital Medical Center            )
3300 East Guasti Road            )
Ontario, CA 91761            )

PRIME HEALTHCARE SERVICES d/b/a Centinela )
Hospital Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Chino Valley )
Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Dallas Medical )
Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Dallas )
Regional Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Desert Valley )
Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a East Liverpool )
City Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Encino )
Hospital Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Garden City )
Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Garden Grove )
Hospital & Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )

PRIME HEALTHCARE SERVICES d/b/a Glendora )
Community Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Harlingen )
Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Huntington )
Beach Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Knapp Medical )
Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a La Palma )
Intercommunity Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Landmark )
Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Lehigh )
Regional Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Lower Bucks )
Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Monroe )
Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )

PRIME HEALTHCARE SERVICES d/b/a Montclair          )
Hospital Medical Center                                            )
3300 East Guasti Road                                             )
Ontario, CA 91761                                                  )
                                                                        )
PRIME HEALTHCARE SERVICES d/b/a North Vista       )
Hospital                                                               )
3300 East Guasti Road                                             )
Ontario, CA 91761                                                  )
                                                                        )
PRIME HEALTHCARE SERVICES d/b/a Pampa            )
Regional Medical Center                                          )
3300 East Guasti Road                                             )
Ontario, CA 91761                                                  )
                                                                        )
PRIME HEALTHCARE SERVICES d/b/a Paradise          )
Valley Hospital                                                       )
3300 East Guasti Road                                             )
Ontario, CA 91761                                                  )
                                                                        )
PRIME HEALTHCARE SERVICES d/b/a Providence        )
Medical Center                                                       )
3300 East Guasti Road                                             )
Ontario, CA 91761                                                  )
                                                                        )
PRIME HEALTHCARE SERVICES d/b/a Riverview         )
Regional Medical Center                                          )
3300 East Guasti Road                                             )
Ontario, CA 91761                                                  )
                                                                        )
PRIME HEALTHCARE SERVICES d/b/a Roxborough       )
Memorial Hospital                                                   )
3300 East Guasti Road                                             )
Ontario, CA 91761                                                  )
                                                                        )
PRIME HEALTHCARE SERVICES d/b/a Saint Clare's     )
Hospital - Denville                                                   )
3300 East Guasti Road                                             )
Ontario, CA 91761                                                  )
                                                                        )
PRIME HEALTHCARE SERVICES d/b/a Saint John        )
Hospital                                                               )
3300 East Guasti Road                                             )
Ontario, CA 91761                                                  )

PRIME HEALTHCARE SERVICES d/b/a Saint Mary's )
Regional Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a San Dimas )
Community Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Shasta Regional )
Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Sherman Oaks )
Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a Southern )
Regional Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a St. Joseph )
Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a St. Joseph )
Mercy Port Huron )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a St. Mary's )
Hospital, Passaic )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a St. Mary's )
Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )

PRIME HEALTHCARE SERVICES d/b/a Suburban )
Community Hospital )
3300 East Guasti Road )
Ontario, CA 91761 )
)
PRIME HEALTHCARE SERVICES d/b/a West Anaheim )
Regional Medical Center )
3300 East Guasti Road )
Ontario, CA 91761 )
)
ROLLING PLAINS MEMORIAL HOSPITAL )
200 East Arizona Street )
Sweetwater, TX 79556 )
)
SHANNON MEDICAL CENTER )
120 East Harris Avenue )
P.O. Box 1879 )
San Angelo, TX 76902 )
)
SISTERS OF CHARITY HEALTH SYSTEM d/b/a Mercy )
Medical Center )
6935 Treeline Drive, Suite J )
Brecksville, OH 44141 )
)
SISTERS OF CHARITY HEALTH SYSTEM d/b/a )
Providence Hospitals )
6935 Treeline Drive, Suite J )
Brecksville, OH 44141 )
)
SISTERS OF CHARITY HEALTH SYSTEM d/b/a )
St. Vincent Charity Medical Center )
6935 Treeline Drive, Suite J )
Brecksville, OH 44141 )
)
SONOMA VALLEY HOSPITAL )
347 Andrieux Street )
Sonoma, CA 95476 )
)
ST LUKE'S HOSPITAL )
5901 Monclova Road )
Maumee, OH 43537 )
)
THE TOLEDO HOSPITAL )
2142 North Cove Boulevard )
Toledo, OH 43606 )

TORRANCE MEMORIAL MEDICAL CENTER )
3330 Lomita Boulevard )
Torrance, CA 90505-5073 )
)
UNIVERSITY HOSPITALS HEALTH SYSTEM d/b/a )
Parma Community General Hospital )
3605 Warrensville Center Road, Room 1218 )
Shaker Heights, OH 44122-5203 )
)
UNIVERSITY HOSPITALS HEALTH SYSTEM d/b/a )
Samaritan Regional Health System )
3605 Warrensville Center Road, Room 1218 )
Shaker Heights, OH 44122-5203 )
)
UNIVERSITY HOSPITALS HEALTH SYSTEM d/b/a )
St. John Medical Center )
3605 Warrensville Center Road, Room 1218 )
Shaker Heights, OH 44122-5203 )
)
UNIVERSITY HOSPITALS HEALTH SYSTEM d/b/a )
UH Cleveland Medical Center )
3605 Warrensville Center Road, Room 1218 )
Shaker Heights, OH 44122-5203 )
)
UNIVERSITY HOSPITALS HEALTH SYSTEM d/b/a )
UH Geauga Medical Center )
3605 Warrensville Center Road, Room 1218 )
Shaker Heights, OH 44122-5203 )
)
UNIVERSITY HOSPITALS HEALTH SYSTEM d/b/a )
UH Regional Hospitals )
3605 Warrensville Center Road, Room 1218 )
Shaker Heights, OH 44122-5203 )
)
UNIVERSITY HOSPITALS HEALTH SYSTEM d/b/a )
University Hospitals Ahuja Medical Center )
3605 Warrensville Center Road, Room 1218 )
Shaker Heights, OH 44122-5203 )
)
UNIVERSITY HOSPITALS HEALTH SYSTEM d/b/a )
University Hospitals Elyria Medical Center )
3605 Warrensville Center Road, Room 1218 )
Shaker Heights, OH 44122-5203 )

UNIVERSITY HOSPITALS HEALTH SYSTEM )
d/b/a University Hospitals Robinson Medical Center )
3605 Warrensville Center Road )
Room 1218 )
Shaker Heights, OH 44122-5203 )
 )
WILLIS-KNIGHTON HEALTH SYSTEM d/b/a Willis )
Knighton Bossier Health Center )
2400 Hospital Drive )
Bossier City, LA 71111 )
 )
WILLIS-KNIGHTON HEALTH SYSTEM d/b/a Willis )
Knighton Medical Center )
Shreveport, LA 711103 )
 )
   Plaintiffs, )
 )
  v. )
 )
SYLVIA MATHEWS BURWELL, Secretary )
United States Department of )
Health and Human Services, )
200 Independence Avenue, S.W. )
Washington, DC  20201, )
 )
   Defendant. )
             )

## COMPLAINT

## I. INTRODUCTION AND NATURE OF SUIT

1. Plaintiffs seek judicial review of a final determination of the Secretary of the Department of Health and Human Services (the "Secretary") to apply a 0.2 percent reduction to the operating inpatient prospective payment system ("IPPS") standardized amount and the capital standard federal payment rate.   Specifically, Plaintiffs raise the following issues:

  a. Whether the Secretary's 0.2 percent downward adjustment to the IPPS standardized amount and capital standard federal payment rate to account for the adoption of the "two-midnight" rule was lawful; and

> b.  If lawful, whether the adjustment was in the correct amount, should have been
>     less of a reduction, or should have resulted in an increase to the standardized
>     amount.

2.     The Secretary's 0.2 percent payment reduction policy went into effect in Federal fiscal year ("FFY") 2014, and continues to apply prospectively to every year thereafter through FFY 2016.   In *Shands Jacksonville Med. Ctr. Inc. v. Burwell*, currently pending, affected providers of Medicare-covered services challenged the Secretary's payment reduction policy as it applies to FFY 2014.  No. 14-263 (D.D.C. filed Feb. 20, 2014) ("*Shands*").  On September 21, 2015, the *Shands* court concluded that the Secretary violated the Administrative Procedure Act ("APA") by "fail[ing] to provide adequate notice of the underlying basis for the proposed reduction, and thereby depriv[ing] the public of a meaningful opportunity to comment on that proposal."  139 F. Supp. 3d 240, 266 (D.C.C. 2015).  The *Shands* court remanded the rulemaking back to the Secretary "to give meaningful consideration to significant comments." *Id*. at 270-71.

3.     This present action concerns the Secretary's decision to carry forward her 0.2 percent payment reduction policy to FFYs 2015 and 2016.

4.     In the IPPS rulemaking for FFY 2014, the Secretary adopted a rule narrowing the coverage of inpatient hospital services payable under IPPS.  ("FFY 2014 Final Rule"), 78 Fed. Reg. 50496, 50938-54 (Aug. 19, 2013).  Under this new rule, Medicare beneficiaries whose stay spanned two midnights are deemed inpatients and, barring "rare and unusual" circumstances, those not meeting the two-midnight threshold are deemed outpatients and correspondingly are paid under the Outpatient Prospective Payment System ("OPPS").  78 Fed. Reg. at 50952-54.  The Secretary estimated that her new rule would result in a net increase in covered inpatient hospital stays.  *Id*. at 50952-54.  Relying on this estimate without adequately explaining her

methodology, the Secretary implemented a permanent 0.2 percent reduction in inpatient hospital payment rates to offset the perceived financial impact of her new coverage rule. *Id*. The Secretary carried forward this payment reduction policy in setting hospital payment rates for inpatient services for FFYs 2015 and 2016—the years at issue in this case. ("FFY 2015 Final Rule"), 79 Fed. Reg. 49853, 50146-48 (Aug. 22, 2014); ("FFY 2016 Final Rule"), 80 Fed. Reg. 49325, 49593-94 (Aug. 17, 2015). In response to the *Shands* litigation, the Secretary subsequently proposed (but has not yet finalized) to permanently remove the 0.2 percent reduction in IPPS payment rates and make a one-time, 0.6 percent adjustment to FFY 2017 rates to address the effects of the two-midnight policy. *See* 81 Fed. Reg. 24946, 25137-38 (April 27, 2016). To date, the 0.2 percent rate cuts for FFY 2014-2016 remain in effect.

5.      All of the Plaintiff hospitals are reimbursed by Medicare pursuant to IPPS payment rates. Plaintiffs challenge and seek an order declaring invalid and setting aside the provisions of the FFY 2015 Final Rule and FFY 2016 Final Rule that carry forward the 0.2 percent reduction policy. The Secretary's decisions to carry forward this adjustment to the operating IPPS standardized amount and the capital standard federal payment rate for FFYs 2015 and 2016 are unlawful and should be reversed because:

    a. The adjustments exceed the Secretary's statutory authority to adjust IPPS standardized amounts;

    b. The amount of the adjustments are unsupported by data, and are arbitrary and capricious; and

    c. The Secretary violated the APA's notice and comment rulemaking requirements because her rulemaking contained insufficient discussion of the data and assumptions that purportedly supported the amount of the

adjustments, and because the Secretary failed to address or take into account public comments to the proposed rule.

6.     Furthermore, Plaintiffs request that the Secretary's adjustments described above be overturned, and seek an order instructing the Secretary to re-propose an adjustment to the IPPS payment rates that is consistent with the data cited by the Secretary.

7.     In the alternative, Plaintiffs seek a declaration that the Secretary lacks the statutory authority to reduce IPPS payment rates in this situation.

## II.     PARTIES

8.     The Plaintiffs in this action consist of eighty-eight (88) hospitals that participate in the Medicare program:

- Arrowhead Regional Medical Center, Medicare Provider No. 05-0245;

- Aspirus Wausau Hospital, Medicare Provider No. 52-0030;

- Baton Rouge General Medical Center, Medicare Provider No. 19-0065;

- Bay Park Community Hospital, Medicare Provider No. 36-0259;

- Bixby Medical Center, Medicare Provider No. 23-0005;

- Central Maine Medical Center, Medicare Provider No. 20-0024;

- Danbury Hospital, Medicare Provider No. 07-0033;

- Eastern Oklahoma Medical Center, Medicare Provider No. 37-0040;

- Flower Hospital, Medicare Provider No. 36-0074;

- Franciscan Missionaries of Our Lady Health System d/b/a Our Lady of The Lake Regional Medical Center, Medicare Provider No. 19-0064;

- Franciscan Missionaries of Our Lady Health System d/b/a Our Lady of The Lourdes Regional Medical Center, Medicare Provider No. 19-0102;

- Franciscan Missionaries of Our Lady Health System d/b/a Saint Elizabeth Hospital, Medicare Provider No. 19-0242;

- Franciscan Missionaries of Our Lady Health System d/b/a St. Francis Medical Center, Medicare Provider No. 19-0125;

- Hardin Memorial Hospital, Medicare Provider No. 18-0012;

- Hi-Desert Medical Center, Medicare Provider No. 05-0279;

- Huntsville Memorial Hospital, Medicare Provider No. 45-0347;

- Lafayette General Health d/b/a Acadia General Hospital, Medicare Provider No. 19-0044;

- Lafayette General Health d/b/a Lafayette General Medical Center, Medicare Provider No. 19-0002;

- Lafayette General Health d/b/a Lafayette General Surgical Hospital, Medicare Provider No. 19-0268;

- Lafayette General Health d/b/a University Hospital & Clinics, Medicare Provider No. 19-0006;

- Lima Memorial Health System, Medicare Provider No. 36-0009;

- Marin General Hospital, Medicare Provider No. 05-0360;

- Memorial Hospital, Medicare Provider No. 36-0156;

- Metrohealth Medical Center, Medicare Provider No. 36-0059;

- Monroe Regional Hospital, Medicare Provider No. 23-0099;

- Mount Nittany Medical Center, Medicare Provider No. 39-0268;

- New Milford Hospital, Medicare Provider No. 07-0015;

- North Oaks Medical Center, LLC, Medicare Provider No. 19-0015;

- Norwalk Hospital, Medicare Provider No. 07-0034;

- Prime Healthcare Services d/b/a Alvarado Hospital Medical Center, Medicare Provider No. 05-0757;

- Prime Healthcare Services d/b/a Centinela Hospital Medical Center, Medicare Provider No. 05-0739;

- Prime Healthcare Services d/b/a Chino Valley Medical Center, Medicare Provider No. 05-0586;

- Prime Healthcare Services d/b/a Dallas Medical Center, Medicare Provider No. 45-0379;

- Prime Healthcare Services d/b/a Dallas Regional Medical Center, Medicare Provider No. 45-0688;

- Prime Healthcare Services d/b/a Desert Valley Hospital, Medicare Provider No. 05-0709;

- Prime Healthcare Services d/b/a East Liverpool City Hospital, Medicare Provider No. 36-0096;

- Prime Healthcare Services d/b/a Encino Hospital Medical Center, Medicare Provider No. 05-0158;

- Prime Healthcare Services d/b/a Garden City Hospital, Medicare Provider No. 23-0244;

- Prime Healthcare Services d/b/a Garden Grove Hospital & Medical Center, Medicare Provider No. 05-0230;

- Prime Healthcare Services d/b/a Glendora Community Hospital, Medicare Provider No. 05-0205;

- Prime Healthcare Services d/b/a Harlingen Medical Center, Medicare Provider No. 45-0855;

- Prime Healthcare Services d/b/a Huntington Beach Hospital, Medicare Provider No. 05-0526;

- Prime Healthcare Services d/b/a Knapp Medical Center, Medicare Provider No. 45-0128;

- Prime Healthcare Services d/b/a La Palma Intercommunity Hospital, Medicare Provider No. 05-0580;

- Prime Healthcare Services d/b/a Landmark Medical Center, Medicare Provider No. 41-0011;

- Prime Healthcare Services d/b/a Lehigh Regional Medical Center, Medicare Provider No. 10-0107;

- Prime Healthcare Services d/b/a Lower Bucks Hospital, Medicare Provider No. 39-0070;

- Prime Healthcare Services d/b/a Monroe Hospital, Medicare Provider No. 15-0164;

- Prime Healthcare Services d/b/a Montclair Hospital Medical Center, Medicare Provider No. 05-0758;

- Prime Healthcare Services d/b/a North Vista Hospital, Medicare Provider No. 29-0005;

- Prime Healthcare Services d/b/a Pampa Regional Medical Center, Medicare Provider No. 45-0099;

- Prime Healthcare Services d/b/a Paradise Valley Hospital, Medicare Provider No. 05-0024;

- Prime Healthcare Services d/b/a Providence Medical Center, Medicare Provider No. 17-0146;

- Prime Healthcare Services d/b/a Riverview Regional Medical Center, Medicare Provider No. 01-0046;

- Prime Healthcare Services d/b/a Roxborough Memorial Hospital, Medicare Provider No. 39-0304;

- Prime Healthcare Services d/b/a Saint Clare's Hospital - Denville, Medicare Provider No. 31-0050;

- Prime Healthcare Services d/b/a Saint John Hospital, Medicare Provider No. 17-0009;

- Prime Healthcare Services d/b/a Saint Mary's Regional Medical Center, Medicare Provider No. 29-0009;

- Prime Healthcare Services d/b/a San Dimas Community Hospital, Medicare Provider No. 05-0588;

- Prime Healthcare Services d/b/a Shasta Regional Medical Center, Medicare Provider No. 05-0764;

- Prime Healthcare Services d/b/a Sherman Oaks Hospital, Medicare Provider No. 05-0755;

- Prime Healthcare Services d/b/a Southern Regional Medical Center, Medicare Provider No. 11-0165;

- Prime Healthcare Services d/b/a St. Joseph Medical Center, Medicare Provider No. 26-0085;

- Prime Healthcare Services d/b/a St. Joseph Mercy Port Huron, Medicare Provider No. 23-0031;

- Prime Healthcare Services d/b/a St. Mary's Hospital, Passaic, Medicare Provider No. 31-0006;

- Prime Healthcare Services d/b/a St. Mary's Medical Center, Medicare Provider No. 26-0193;

- Prime Healthcare Services d/b/a Suburban Community Hospital, Medicare Provider No. 39-0116;

- Prime Healthcare Services d/b/a West Anaheim Regional Medical Center, Medicare Provider No. 05-0426;

- Rolling Plains Memorial Hospital, Medicare Provider No. 45-0055;

- Shannon Medical Center, Medicare Provider No. 45-0571;

- Sisters Of Charity Health System d/b/a Mercy Medical Center, Medicare Provider No. 36-0070;

- Sisters Of Charity Health System d/b/a Providence Hospitals, Medicare Provider No. 42-0026;

- Sisters Of Charity Health System d/b/a St. Vincent Charity Medical Center, Medicare Provider No. 36-0037;

- Sonoma Valley Hospital, Medicare Provider No. 05-0090;

- St. Luke's Hospital, Medicare Provider No. 36-0090;

- The Toledo Hospital, Medicare Provider No. 36-0068;

- Torrance Memorial Medical Center, Medicare Provider No. 05-0351;

- University Hospitals Health System d/b/a Parma Community General Hospital, Medicare Provider No. 36-0041;

- University Hospitals Health System d/b/a Samaritan Regional Health System, Medicare Provider No. 36-0002;

- University Hospitals Health System d/b/a St. John Medical Center, Medicare Provider No. 36-0123;

- University Hospitals Health System d/b/a UH Cleveland Medical Center, Medicare Provider No. 36-0137;

- University Hospitals Health System d/b/a UH Geauga Medical Center, Medicare Provider No. 36-0192;

- University Hospitals Health System d/b/a UH Regional Hospitals, Medicare Provider No. 36-0075;

- University Hospitals Health System d/b/a University Hospitals Ahuja Medical Center, Medicare Provider No. 36-0359;

- University Hospitals Health System d/b/a University Hospitals Elyria Medical Center, Medicare Provider No. 36-0145;

- University Hospitals Health System d/b/a University Hospitals Robinson Medical Center, Medicare Provider No. 36-0078;

- Willis-Knighton Health System d/b/a Willis Knighton Bossier Health Center, Medicare Provider No. 19-0236;

- Willis-Knighton Health System d/b/a Willis Knighton Medical Center, Medicare Provider No. 19-0111.

9.      Defendant Sylvia M. Burwell is the Secretary of the United States Department of Health and Human Services, the Federal agency that administers the Centers for Medicare & Medicaid Services ("CMS").  CMS is the Federal agency to which the Secretary has delegated administrative authority over the Medicare program which is established under title XVIII of the Social Security Act.  *See* 42 U.S.C. § 301 *et seq.*  References to the Secretary herein are meant to refer to her, her subordinate agencies and officials, and to her official predecessors or successors as the context requires.

### III.      JURISDICTION AND VENUE

10.      This action arises under the Medicare statute, title XVIII of the Social Security Act, 42 U.S.C § 1395, and the APA, 5 U.S.C. § 551.

11.      Jurisdiction is proper under 42 U.S.C. §§ 1395oo(a)(1)(A)(ii) and 1395oo(f)(1).

12.      Venue is proper in this judicial district under 42 U.S.C. § 1395oo(f)(1).

### IV.      MEDICARE PAYMENT FOR INPATIENT AND OUTPATIENT HOSPITAL SERVICES

13.      The Medicare program provides federally funded health insurance for certain elderly and disabled persons under title XVIII of the Social Security Act.  42 U.S.C. § 1395. Part A of the Medicare program covers inpatient hospital services.  42 U.S.C. § 1395d(a)(1). Part B pays for certain hospital services not covered by Part A, including outpatient medical services.  42 U.S.C. § 1395k(a)(1).

14.      Medicare Part A pays hospitals for inpatient hospital services on a per discharge basis under the IPPS.  42 U.S.C. § 1395ww(d); 42 C.F.R. § 412.2(a).  A hospital is entitled to an IPPS payment for each patient who is formally and appropriately admitted as an inpatient by order of a physician.  *See* 42 C.F.R. § 412.3.  Patients who receive hospital services without

being formally and/or appropriately admitted as inpatients are deemed outpatients, and Medicare pays for their care according to the OPPS. *See* 42 U.S.C. § 1395l(t); 42 C.F.R. § 419.21(b).

15.     Hospitals receive payment under IPPS for operating costs associated with covered inpatient discharges. 42 U.S.C. § 1395ww(d)(3); 42 C.F.R. § 412.2(c). The amount paid for a covered discharge is the product of a base rate per discharge—the standardized amount as updated annually by the Secretary for inflation, 42 U.S.C § 1395ww(d)(2)(C); 42 C.F.R. § 412.64(c)—and the weighted rate for the patient's condition at the time of admission—the diagnosis-related group (DRG), 42 U.S.C § 1395ww(d)(4); 42 C.F.R. § 412.60—relative to the average cost for treating Medicare beneficiaries in the same DRG. Hospitals also receive per-discharge payments under IPPS for capital-related costs of inpatient hospital services. 42 U.S.C. § 1395ww(g). These costs are paid at a standard Federal rate adjusted annually by the Secretary for inflation and other factors. 42 § C.F.R. 412.304(c). The Secretary may, under her exceptions and adjustments authority, adjust the standardized amount as she deems appropriate. 42 U.S.C. § 1395ww(d)(5)(I)(i).

## V.     THE MEDICARE APPEALS PROCESS

16.     Section 1878(a) of the Social Security Act entitles a provider of services under the Medicare program to a hearing before the Provider Reimbursement Review Board ("PRRB") if three prerequisites are met: (i) the provider is dissatisfied with a final determination of the Secretary as to the amount of the payment under the Medicare Act;  (ii) the provider files a request for hearing within 180 days of the final determination; and (iii) the amount in controversy is at least $10,000 for an individual appeal, or $50,000 for a group appeal. 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835. If an appeal satisfies these requirements, the PRRB has jurisdiction to hear the appeal. *Id.*

17.     When the PRRB has jurisdiction to hear an appeal, but the appeal involves a statute or regulation that the PRRB is without authority to overturn, the PRRB may, through its own motion or upon request of the provider, grant expedited judicial review ("EJR") of the appeal.  42 U.S.C. § 1395oo(f)(1).  If EJR is granted, the provider can seek judicial review in federal court without first having a hearing before the PRRB.  *Id.*  The provider must file its complaint no later than 60 days after receiving notice of the PRRB's decision to grant EJR.  *Id.*

## VI.     THE FFY 2014 RULEMAKING

18.     In a FFY 2014 rulemaking, the Secretary modified the standard by which patients covered by Medicare may properly be admitted as inpatients, and by consequence, when their care is compensable under IPPS.  Prior to the 2014 rulemaking, inpatient admission was deemed appropriate for Medicare beneficiaries who were expected to remain in the hospital for at least one overnight stay.  *See* 78 Fed. Reg. at 50907; Medicare Benefit Policy Manual, ch. 1, § 10. Under the new two-midnight rule established in the FFY 2014 Final Rule, when a patient enters a hospital for a surgical procedure, diagnostic test, or any other treatment, and the physician expects to keep the patient in the hospital for only a limited period of time that *does not* cross two midnights, the services are generally considered inappropriate for inpatient admission, even if formally admitted as an inpatient.  78 Fed. Reg. at 50944-49; 42 C.F.R. § 412.3(e)(1). Inpatient stays that do not meet these standards are to be reimbursed on an outpatient basis under Medicare Part B.  78 Fed. Reg. at 50944.

19.     When proposing the two-midnight rule during informal rulemaking, the Secretary estimated that the rule would result in  an aggregate increase in IPPS payments.  The Secretary purported to use prior patient encounters from FFY 2009 through FFY 2011 to project the number of encounters that would change from inpatient to outpatient (and vice-versa) under the

new two-midnight policy.  *See* FFY 2014 Proposed Rule, 78 Fed. Reg. 27486, 27649 (May 10, 2013).  Her actuaries estimated that approximately 400,000 encounters would shift from outpatient to inpatient and approximately 360,000 encounters would annually shift from inpatient to outpatient, for a net change of 40,000 new inpatients.  78 Fed. Reg. at 27649; *see also* FFY 2014 Final Rule, 78 Fed. Reg. at 50952-54.  The Secretary calculated that these 40,000 new inpatient admissions would increase IPPS expenditures by $220 million annually, or 0.2 percent of the annual total.  78 Fed. Reg. at 27649.  To ensure that the two-midnight rule was budget-neutral, the Secretary proposed to use her exceptions and adjustments authority under section 1886(d)(5)(I)(i) of the Social Security Act, 42 U.S.C. § 1395ww(d)(5)(I)(i), to offset the perceived impact of the rule by applying a permanent reduction of 0.2 to the IPPS payment rates. 78 Fed. Reg. at 27650.  Therefore, CMS applied a downward adjustment to the operating IPPS standardized amount, the capital standard federal payment rate, sole community hospitals' and Medicare-dependent hospitals' hospital-specific rates, and the Puerto Rico-specific amount, each by 0.2 percent to achieve budget neutrality.  78 Fed. Reg. at 50952-54.

20.    The Secretary's calculations were not supported by the data she cited. Commenters to the proposed rule challenged the Secretary's calculations and, using the very same publicly available Medicare she cited—patient encounters from FFY 2009 through FFY 2011—were unable to replicate her conclusion on the number of encounters that would migrate between inpatient and outpatient status as a result of the two-midnight policy.  *See* Exhibit 1 at 9-11.  For example, contrary to the Secretary's estimate that 400,000 encounters would shift to inpatient status, the available Medicare data showed that there were only 121,662 observation stays of 48 hours or less in 2011, and an average of only 105,822 per year in for the years 2009 and 2011.  Exhibit 1 at 10.

21.     Commenters also questioned the Secretary's estimate that 360,000 inpatient stays would shift to outpatient encounters.  In a report released in 2012, the Secretary estimated that there were 1,569,693 inpatient stays of one day in calendar year 2011.  *See* 2012 Medicare & Medicaid Statistical Supplement at Table 5.9, available at http://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MedicareMedicaidStatSupp/2012.html (which is part of the rulemaking record as an exhibit to comments submitted by King & Spalding; *see* Exhibit 1 at 33).  Even excluding patients who died, were transferred to another hospital or a SNF, or left the hospital against medical advice, the Secretary's estimate in her FFY 2014 rulemaking that only 360,000 inpatient stays would shift to outpatient encounters is substantially lower than the Secretary's prior 2012 estimate of the number of one-day inpatient stays from calendar year 2011.  The commenters noted that under the two-midnight rule, nearly all 1,569,693 one day inpatient stays would shift to outpatient encounters.  Exhibit 1 at 10.

22.     Notwithstanding the concerns raised by commenters, the Secretary adopted the 0.2 percent IPPS payment rate reduction as proposed.  78 Fed. Reg. at 50938-54.  In the FFY 2014 Final Rule, the Secretary did not respond to the commenters' request for the calculations the Secretary used to estimate that 400,000 outpatient encounters would shift to inpatient status.  Nor did the Secretary furnish the requested calculations showing how she arrived at her estimate that the predicted net 40,000 patient shift from outpatient to inpatient status would result in a net increase of $220 million in IPPS payments.

23.     In the FFY 2014 Final Rule, the Secretary explained that the impact analysis her actuaries prepared for the two-midnight rule considered only the movement from inpatient to outpatient status of surgical admissions, not medical admissions (i.e. those admissions not related

to surgeries) resulting from application of the two-midnight rule.  78 Fed. Reg. at 5093.  This is a significant exclusion because surgical MS-DRG cases account for only 24.8 percent of Medicare-covered inpatient discharges in FFY 2011—the most recent year for which data is publicly available.  Exhibit 2 at 2, 27.  The remainder, which is attributable to medical MS-DRG cases, was not considered in the Secretary's impact analysis for the two-midnight rule. Nonetheless, the Secretary's explanation does not reconcile the data such that it accounts for her incorrect determination that 40,000 cases in the aggregate would move from outpatient encounters to inpatient stays.  And even if the explanation did reconcile the difference, which it does not, the Secretary has not adequately explained why she excluded medical MS-DRG cases from her impact analysis.  According to a report prepared by CMS actuaries—which the Secretary relied upon to support the 0.2 percent payment reduction—medical MS-DRG cases were excluded because it was assumed that these cases would be unaffected by the policy change.  Exhibit 2 at 24.  However, neither the CMS actuaries who prepared this report nor the Secretary provided any explanation to support the assumption that medical MS-DRG cases would not be affected by the two-midnight rule.

24.     The 2014 rulemaking is currently at issue in the *Shands* case in front of the D.C. District Court.  In *Shands*, District Court Judge Randolph Moss "agree[d] that the Secretary's failure to disclose the critical assumptions relied upon by the HHS actuaries deprived Plaintiffs and other members of the public of a meaningful opportunity to comment on the proposed 0.2 percent reduction."  139 F. Supp. 3d at 263.  The Secretary's decision to analyze the two-midnight rule's effect only on surgical cases was, in the court's view, central to the analysis that led to the Secretary's conclusion that 40,000 discharges would shift to inpatient status in 2014, and, without that information, commenters had no basis to understand or to critique the

Secretary's conclusion. *Id.* Judge Moss ultimately concluded that the Secretary violated the Administrative Procedure Act and remanded the case back to the Secretary to explain its rationale and provide another comment period for hospitals to respond to its underlying assumptions. *Id.* at 271.

25.     Following another round of comments, the Secretary announced on April 18, 2016 that she would prospectively remove, beginning in FFY 2017, the 0.2 percent reduction to the rates put in place beginning in FFY 2014. *See* 2017 IPPS Proposed Rule, 81 Fed. Reg. at 25136-38. In addition, the Secretary announced that she would temporarily increase rates for FFY 2017 in an effort to compensate for the effect of the 0.2 percent reduction to rates from FFYs 2014-2016. *Id.* Those changes have yet to be finalized in rulemaking.

### VII.     ERRORS CARRIED FORWARD TO THE FFY 2015 RULEMAKING

26.     Prior to the decision in *Shands*, the Secretary carried forward the same errors in her rulemaking setting the IPPS payment rates for FFY 2015. Again, hospitals submitted comments to the proposed rule challenging the Secretary's reasoning in calculating the estimated number of new inpatient and outpatient encounters affected by implementation of the two-midnight rule. *See* Exhibit 2. Commenters repeated and incorporated by reference the above described challenge and objections to the FFY 2014 rulemaking and challenged the post hoc rationalization provided by the Secretary in the FFY 2014 Final Rule. Exhibit 2 at 2.

27.     Now aware that the Secretary excluded medical cases in her actuarial model, commenters challenged this assumption as irrational and unsupported by the data. Exhibit 2 at 2. Ultimately, neither the Secretary nor the CMS actuaries who prepared the impact statement for the two-midnight rule provided an explanation supporting the assumption that medical MS-DRG would not be affected by the two-midnight rule—nor could they. For example, commenters

noted that for FY 2011, the most recent year for which there is data publicly available, only 24.8 percent of all Medicare hospital inpatient discharges were for surgical MS-DRGs.  Exhibit 2 at 2. Medicare data for FFYs 2009 and 2011 shows that, of the 25 most frequently claimed MS-DRG cases with lengths of stay less than two days—which would likely shift from inpatient to outpatient encounters under the two-midnight rule—16 were medical MS-DRG cases and only 9 were surgical MS-DRG cases.  Exhibit 2 at 3.

28.     Despite the   concerns raised by commenters in the rulemaking process, the Secretary completely ignored these comments.  FFY 2015 Final Rule, 79 Fed. Reg. at 50147 ("We thank commenters for the many comments submitted on this issue, and we will take these into account in any potential future rulemaking.").  She instead continued to implement her 0.2 percent reduction to IPPS payment rates for FFY 2015 without engaging in any reasoned analysis. *Id*. at 49995.

## VIII.   ERRORS IN THE FFY 2016 RULEMAKING

29.     The Secretary continued to apply the 0.2 percent payment reduction in her FFY 2016 rulemaking.  80 Fed. Reg. at 49593.  In the 2016 Final Rule, the Secretary acknowledged comments opposing continued application of the rate reduction, but deferred any meaningful response until later a rulemaking.  As she did the year before, the Secretary continued to implement her 0.2 percent reduction in IPPS payment rates without addressing commenters' concerns about how the adjustment was calculated.

30.     The Secretary once again addressed the two-midnight policy in the FY 2016 OPPS rulemaking.  Although this rulemaking implemented certain changes to what constitutes an inpatient stay, it nonetheless maintained the 0.2 percent reduction to IPPS payment rates.  *See*

80 Fed. Reg. 70298, 70538-49 (Nov. 13, 2015).   Comments submitted in response to this rulemaking are at Exhibit 3.

## IX.     PROCEDURAL HISTORY

31.     The Plaintiffs challenged the Secretary's IPPS payment rate cut pursuant to the procedures set forth at 42 U.S.C. § 1395oo.  The Plaintiffs filed group appeals with the PRRB. The Plaintiffs' appeals satisfied all of the jurisdictional requirements for a group appeal set forth at 42 U.S.C. § 1395oo(a)-(b).

32.     The PRRB determined that it had jurisdiction to hear the Plaintiffs' appeals, but lacked authority to overturn the payment rate cut associated with the Secretary's two-midnight regulation, *see* 42 C.F.R. § 405.1867.  Therefore, by letters dated July 6, July 8, 2016 and July 11, 2016, the PRRB granted EJR for the Plaintiffs' appeals.  The Plaintiffs now file this civil action within 60 days of the Board's decisions, claiming that the Secretary's FFYs 2015 and 2016 0.2 percent IPPS rate cuts are invalid for the reasons set forth below.

## COUNT I
## Violation of the Administrative Procedure Act
## Arbitrary and Capricious Agency Action

33.     The allegations set forth in paragraphs 1 through 32 are incorporated by reference as if fully set forth herein.

34.     The Secretary's decision to carry forward her 0.2 percent IPPS payment rate reduction policy to FFYs 2015 and 2016 is arbitrary and capricious in violation of the APA, 5 U.S.C. § 706(2)(A), because the adjustments run counter to the data upon which she relied.  The Medicare claims data the Secretary used to calculate her impact analysis show more than 1.5 million one-day inpatient stays in 2011 and does not support her assertion in rulemaking that only 360,000 one-day inpatient stays would move to outpatient status under the two-midnight

rule.  The Secretary did not adequately explain how this 1.5 million figure could be reduced down to 360,000 as she asserted in rulemaking.  Similarly, the data do not support her assertion that 400,000 outpatient encounters would move to inpatient status.  Thus, the Secretary's assertion that a net of 40,000 patients would shift from outpatient to inpatient status—the very basis for her decision to apply a 0.2 percent reduction to IPPS payment rates—"runs counter to the evidence before the agency" and her adjustment must be set aside.  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (agency action must be set aside "if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.").

35.     The Secretary's decision to impose 0.2 percent downward adjustments in the IPPS payment rates for FFY 2015 and 2016 is also arbitrary and capricious because the only explanation she has attempted to provide is irrational and unsatisfactory.  Citing to Medicare claims data that demonstrate that there were more than 1.5 million one-day inpatient stays in 2011 and, on average, only 105,000 outpatient encounters of more than 48 hours between 2009 and 2011, commenters challenged the Secretary to provide additional explanation, or cite additional data, that would support her conclusion that the two-midnight rule would result in only 360,000 one-day inpatient stays moving to outpatient encounters.  Exhibit 1 at 9-11.  The Secretary never fully responded to this comment, but stated for the first time in the FFY 2014 Final Rule that her impact analysis considered only the movement from inpatient to outpatient status of surgical MS-DRG cases—that is, inpatient stays resulting from surgical procedures— and not   medical MS-DRG cases.   FFY 2014 Final Rule, 78 Fed. Reg. at 50953.   This explanation is irrational because the two-midnight rule applies with equal force to surgical and

medical MS-DRG cases.  It was therefore irrational for the Secretary to exclude medical MS-DRG cases in her impact analysis, and to rely on that analysis in implementing her 0.2 percent IPPS payment rate reduction policy.  Because the Secretary carried over this analysis and exclusion of medical MS-DRG cases in the FFY 2015 and FFY 2016 Final Rules, that action remains arbitrary and capricious.

36.     Similarly, the Secretary failed to provide a rational explanation (indeed, she provided no explanation) as to how she determined that the two-midnight rule would result in 400,000 outpatient encounters moving to inpatient stays when the Medicare claims data upon which she relied demonstrate that there are far fewer outpatient encounters of 48 hours or more in FFY 2009 through 2011.

## COUNT II
### Violation of the Administrative Procedure Act
### Arbitrary and Capricious Agency Action

37.     The allegations set forth in paragraphs 1 through 36 are incorporated by reference as if fully set forth herein.

38.     The Secretary's decision not to increase or enact an upward adjustment in IPPS payment rates violates the APA as well.  During the FFY 2014 rulemaking, the Secretary stated the "widespread impact of the proposed two-midnight policy on the IPPS" was such that it required her to invoke her authority under section 1886(d)(5)(I)(i) of the Social Security Act to make adjustments to IPPS payment rates.  78 Fed. Reg. at 50953.  Citing Medicare reimbursement claims data demonstrating that implementation of the two-midnight rule would result in approximately 1 million one-day inpatient stays transitioning from inpatient to outpatient status, thereby lowering IPPS aggregate payments, commenters demonstrated that an appropriate adjustment to offset the "widespread impact of the proposed two-midnight policy on

the IPPS" would be an increase or upward adjustment to IPPS rates.  Exhibit 1 at 9-11.  The Secretary rejected this comment and thereby made a final determination to reduce IPPS payment rates rather than increase them.  This decision was arbitrary and capricious because it "runs counter to the evidence before the agency" and must be set aside.  *Motor Vehicle Mfr. Ass'n*, 463 U.S. at 43.  The Secretary carried forward this error in FFY 2015 by again declining to exercise her adjustments and exceptions authority under section 1886(d)(5)(I)(i) to increase IPPS payment rates by an amount consistent with the data.

**COUNT III**
**Violation of the Administrative Procedure Act**
**Action Without Observance of Procedure Required By Law**

39.      The allegations in paragraphs 1 through 38 are incorporated by reference as if fully set forth herein.

40.      The Social Security Act, 42 U.S.C. § 1395hh(b), and the APA, 5 U.S.C. § 553, require the Secretary to utilize public notice and comment rulemaking procedures when establishing substantive changes in payment for services covered under the Medicare statute. The Secretary committed several procedural errors in her FFY 2014 rulemaking that first implemented her 0.2 percent IPPS payment rate reduction policy, and in her FFYs 2015 and 2016 rulemakings carrying forward that policy.  These missteps constitute unlawful agency action "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

41.      First, the Secretary altogether failed to respond to  significant comments to her FFYs 2014, 2015 and 2016 rulemaking.  An agency has a duty to respond to significant comments that directly challenge the basis and purpose of the agency's rule.  *See, e.g., Ala. Power Co. v. Costle*, 636 F.2d 323, 384 (D.C. Cir. 1979) ("[T]he duty to respond to significant comments finds a statutory basis in required notice and comment procedures, for 'the

opportunity to comment is meaningless unless the agency responds to significant points raised by the public.'") (quoting *Home Box Office*, *Inc. v. FCC*, 567 F.2d 9, 35-36 (D.C. Cir. 1977)).  But the Secretary here entirely failed to respond to commenters who demonstrated that Medicare reimbursement claims data did not support her conclusion that adoption of the two-midnight rule would lead to an increase in IPPS expenditures.  Furthermore, in the FFY 2015 rulemaking, the Secretary failed to explain why medical MS-DRG cases were excluded from her impact analysis. These failures independently requires the payment reduction to be set aside.

42.     Second, the Secretary relied upon at least one critical assumption for which the public was not afforded an opportunity to meaningfully comment.  The notice and comment rulemaking procedures require agencies to identify and make available technical studies and data that they employ in reaching the decisions to propose particular rules.  *Conn. Light & Power Co. v. Nuclear Regulatory Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982.   "An agency's denial of a fair opportunity to comment on a key study may fatally taint the agency's decisional process." *Nat'l Ass'n of Regulatory Util. Comm'rs v. F.C.C.*, 737 F.2d 1095, 1121 (D.C. Cir. 1984).  In the FFY 2014 rulemaking, the Secretary failed to disclose—until after the comment period had ended—her critical actuarial assumption that medical MS-DRG cases would not be affected by the two-midnight rule.  FFY 2014 Final Rule 78 Fed. Reg. at 50953.  As a result, commenters were not put on notice that the Secretary's estimates did not consider the migration of medical MS-DRG cases from inpatient to outpatient status, and were therefore deprived of  an opportunity to meaningfully comment on the Secretary's methodology.  This procedural blunder fatally taints the Secretary's decisional process in implementing the 0.2 percent IPPS payment rate reduction policy, and her decision to carry forward that policy to FFYs 2015 and 2016.

43.     Furthermore, while the Secretary's baseline assumptions roughly corresponded to the commenters' based on publicly available Medicare data, *see* Exhibit 1 at 9-10, the Secretary did not adequately explain her methodology, including any other assumptions she used to derive her proposed 0.2 percent downward adjustment or her decision to finalize that adjustment.  If the Secretary relied upon data that were different than that relied upon by the commenters, she did not disclose that data to the public.  To the extent that the Secretary believes her adjustment is supported by the data, there are only two possible conclusions: she did not make a full disclosure of the data and assumptions that led to her conclusion or she simply bungled the math.  Either conclusion requires the Court to set aside the Secretary's payment reduction as contrary to law.

## COUNT IV
## Violation of the Administrative Procedure Act
## Agency Action in Excess of Statutory Authority

44.     The allegations in paragraphs 1 through 43 are incorporated by reference as if fully set forth herein.

45.     Alternatively, the Secretary does not have the authority under section 1886(d)(5)(I)(i) of the Social Security Act, or any other provision of law, to make a downward adjustment in the rates set under section 1886(d) for the reasons articulated in the FFY 2014 Final Rule, and carried forward to the FFYs 2015 and 2016 Final Rules.  The two-midnight rule affects the number of cases that would be paid under IPPS rates—that is, it affects the number of cases that are covered under Part A.  Applying budget neutrality to volume changes caused by policy decisions violates the fundamental structure and policy that has governed the IPPS since its inception in 1983.  By design, the IPPS adjusts annually to both the service mix and volume of hospital admissions, which vary from year to year based on many factors.  The structure of the

statute makes clear, therefore, that Congress did not intend to allow the Secretary to use section 1886(d)(5)(I)(i) to make adjustments to account for changes in volume.

46.     For the foregoing reasons, the Secretary's adjustment to IPPS payment rates cannot stand and must be overturned.

## VII.    **RELIEF REQUESTED**

The Plaintiffs request an Order:

a.     Declaring invalid and setting aside the Secretary's calculation, establishment, and application of the standardized amount and the capital standard federal payment rates for FFYs 2015 and 2016 paid to the Plaintiffs pursuant to the final determinations of the Secretary in her FFY 2014 IPPS Final Rule and carried forward to the FFYs 2015 and 2016 Final Rules;

b.     Requiring the Secretary to recalculate the appropriate increase in the standardized amount and the capital standard federal payment rates for FFYs 2015 and 2016 in order to offset the aggregate decrease in IPPS payments resulting from adoption of the two-midnight rule and pay the Plaintiffs the additional sums due them as a result of such recalculation, plus interest calculated in accordance with 42 U.S.C. § 1395oo(f)(2);

c.     Requiring the Secretary to pay legal fees and costs of suit incurred by the Plaintiffs; and

d.     Providing such other relief as the Court may consider appropriate.

Respectfully submitted,


/s/ Daniel J. Hettich
Daniel J. Hettich
     D.C. Bar No. 975262
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 200
Washington, D.C.  20006
202.626.9128 (phone)
202.626.3737 (fax)
DHettich@kslaw.com


Date:  July 28, 2016